# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

THOMAS A. HIGHTOWER,

        Plaintiff,

    v.

ARNOLD SCHWARZENEGGER, et al.,

        Defendants.

_____/

CASE NO. 1:04-cv-06028-OWW-SMS PC

FINDINGS AND RECOMMENDATION TO DISMISS UNCOGNIZABLE CLAIMS AND TO ALLOW SERVICE ON COGNIZABLE CLAIMS (Doc. 31)

OBJECTIONS DUE WITHIN THIRTY DAYS

I.    <u>Screening Order</u>

Plaintiff Thomas A. Hightower ("plaintiff") is a state prisoner proceeding pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. §§ 1983, 1985, and 1986. Plaintiff filed this action on July 29, 2004. On February 24, 2006, the court dismissed plaintiff's complaint, with leave to amend, for failure to comply with Federal Rule of Civil Procedure 8(a). Plaintiff filed an amended complaint on June 28, 2006. On March 8, 2007, the court dismissed plaintiff's first amended complaint, for failure to state cognizable claims, with leave to amend one last time. On August 13, 2007, plaintiff filed his second amended complaint.

    A.    <u>Screening Requirement</u>

The court is required to screen complaints brought by prisoners seeking relief against a governmental entity or officer or employee of a governmental entity. 28 U.S.C. § 1915A(a). The court must dismiss a complaint or portion thereof if the prisoner has raised claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(b)(1),(2).

1

"Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that . . . the action or appeal . . . fails to state a claim upon which relief may be granted." 28 U.S.C. § 1915(e)(2)(B)(ii).

"Rule 8(a)'s simplified pleading standard applies to all civil actions, with limited exceptions," none of which applies to section 1983 actions. Swierkiewicz v. Sorema N. A., 534 U.S. 506, 512 (2002); Fed. R. Civ. P. 8(a). Pursuant to Rule 8(a), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a). "Such a statement must simply give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Swierkiewicz, 534 U.S. at 512. A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. Id. at 514. "'The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test.'" Jackson v. Carey, 353 F.3d 750, 755 (9th Cir. 2003) (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)); see also Austin v. Terhune, 367 F.3d 1167, 1171 (9th Cir. 2004) ("'Pleadings need suffice only to put the opposing party on notice of the claim . . . .'" (quoting Fontana v. Haskin, 262 F.3d 871, 977 (9th Cir. 2001))). However, "the liberal pleading standard . . . applies only to a plaintiff's factual allegations." Neitze v. Williams, 490 U.S. 319, 330 n.9 (1989). "[A] liberal interpretation of a civil rights complaint may not supply essential elements of the claim that were not initially pled." Bruns v. Nat'l Credit Union Admin., 122 F.3d 1251, 1257 (9th Cir. 1997) (quoting Ivey v. Bd. of Regents, 673 F.2d 266, 268 (9th Cir. 1982)).

B.    Plaintiff's Federal Claims

Plaintiff's second amended complaint is sixty-seven typewritten pages long and contains a plethora of claims against numerous defendants. Instead of stating an overall summary of plaintiff's complaint, the court will address plaintiff's allegations against each defendant by topic.

///

2

1.     Freedom of Religion

The First Amendment to the United States Constitution provides that "Congress shall make no law respecting the establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const., amend. I. Prisoners "retain protections afforded by the First Amendment," including the free exercise of religion. O'Lone v. Estate of Shabazz, 482 U.S. 342, 348, 107 S.Ct. 2400 (1987). However, "'[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.'" Id. (quoting Price v. Johnson, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060 (1948)). "In order to establish a free exercise violation, [a prisoner] must show the defendants burdened the practice of his religion, by preventing him from engaging in conduct mandated by his faith, without any justification reasonably related to legitimate penological interests." Freeman v. Arpaio,125 F.3d 732, 736 (9th Cir. 1997). "In order to reach the level of a constitutional violation, the interference with one's practice of religion 'must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine.'" Freeman, 125 F.3d at 737 (quoting Graham v. C.I.R., 822 F.2d 844, 851 (9th Cir. 1987)).

"To ensure that courts afford appropriate deference to prison officials, . . . prison regulations alleged to infringe constitutional rights are judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." O'Lone, 382 U.S. at 349. Under this standard, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 89, 107 S.Ct. 2254 (1987). First, "there must be a valid, rational connection between the prison regulation and the legitimate government interest put forward to justify it," and "the governmental objective must itself be a legitimate and neutral one." Id. A second consideration is "whether there are alternative means of exercising the right that remain open to prison inmates." Id. at 90 (internal quotations and citation omitted). A third consideration is "the impact accommodation of the asserted right will have on guards

///

and other inmates, and on the allocation of prison resources generally." Id. "Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation." Id.

Plaintiff states that he is making a claim for violation of his right to freedom of religion. Doc. 31, pg. 9. However, he fails to state any facts to indicate that his practice of his religion was burdened in any way other than relative to his inability to receive religious publications from the publisher of his choice. See I.B.2. Therefore, plaintiff has failed to state a cognizable claim for infringement on his right to freely exercise his religion against any defendant(s) named in this action.

2.    Religious Publications/Mailings

Central to his allegations regarding religion are plaintiff claims that his right to receive religious publications has been violated. Plaintiff alleges that, in order for a prisoner to receive publications via mail, the publishers must obtain pre-approval, and that he desires to receive publications from publishers of religious materials (for Seventh Day Adventists "SDA") that are not on the pre-approved list. Plaintiff further alleges that the review board is seated with only main line religious persons who have not approved publications from minority known religious organizations. Plaintiff alleges that he was advised that he could receive publications via SDA clergy, but that no clergy knowledgeable in SDA has been hired. Plaintiff acknowledges that there are a few approved religious publishers, but alleges that this is an unacceptable vehicle for him to obtain his desired publications as the approved religious publishers either do not handle any minority religious materials, or are overpriced and do not offer any free or low cost materials. Thus, plaintiff alleges his constitutional rights have been violated as he is not allowed to receive paid for, or even free mailings from certain publishers.

A prisoner's right to receive publications from outside the prison should be analyzed in light of the Turner factors. See Morrison v. Hall, 261 F.3d 896, 901-02 (9th Cir. 2001).

Prisoners have "a First Amendment right to send and receive mail." Witherow v. Paff, 52 F.3d 264, 265 (9th Cir. 1995). Prison regulations relating to the regulation of incoming mail are analyzed under the Turner reasonableness standard set forth in Turner v. Safley, 482 U.S. 78, 89-91 (1987). Thornburgh v. Abbott, 490 U.S. 401, 413-14 (1989). The regulation is valid if it is

reasonably related to legitimate penological interests. <u>Turner</u>, 482 U.S. at 89. In determining the reasonableness of the regulation, court must consider the following factors: (1) whether there is a "valid, rational connection between the regulation and the legitimate government interest put forward to justify it," (2) "whether there are alternative means of exercising the right," (3) the impact that the "accommodation of the asserted constitutional right will have on guards and other inmates," and (4) "the absence of ready alternatives." <u>Turner</u>, 482 U.S. at 89-90.

Although the prisoner's free exercise right is still subject to the legitimate penological interests of the prison, an inmate who adheres to a minority religion must be given a "reasonable opportunity of pursuing his [or her] faith comparable to the opportunity afforded fellow prisoners who adhere to the conventional religious precepts." <u>Cruz v. Beto</u>, 405 U.S. 319, 322 (1972) (per curiam). "Reasonable opportunities," however, are not the same as identical treatment. <u>See</u> <u>Cruz</u>, 405 U.S. at 322 n.2.

Plaintiff has not alleged that the restriction on his receiving religious publications/mailings from the publisher of his choice is not reasonably related to any legitimate penological interests. In fact, plaintiff admits that the defendants advised him that the publications from the publisher of plaintiff's choice were not allowed due to safety and security concerns. Doc. 31, pg. 56.

Further, plaintiff's allegations acknowledge that there are approved publishers from whom he might obtain materials, but that they are overpriced, or do not offer free or low cost materials. Per his own allegations, there are reasonable opportunities available for plaintiff to obtain SDA publications/mailings from pre-approved publishers. The fact that pre-approved publishers do not offer publications that are "free or low cost" does not vitiate plaintiff's opportunity to pay for and receive their publications. Thus, plaintiff has failed to state a cognizable claim for infringing on his right to receive religious publications/mailings.

          3.    <u>Religious Land Use and Institutionalized</u>
                 <u>Persons Act ("RLUIPA")</u>

The Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") provides:

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution. . . , even if the burden results from

a rule of general applicability, unless the government demonstrates that imposition
of the burden on that person–
(1) is in furtherance of a compelling government interest; and
(2) is the least restrictive means of furthering that compelling government interest.

42 U.S.C. § 2000cc-1. Plaintiff bears the initial burden of demonstrating that defendants

substantially burdened the exercise of his religious beliefs. Warsoldier v. Woodford, 418 F.3d

989, 994-95 (9th Cir. 2005). If plaintiff meets his burden, defendants must demonstrate that "any

substantial burden of [plaintiff's] exercise of his religious beliefs is *both* in furtherance of a

compelling governmental interest *and* the least restrictive means of furthering that compelling

governmental interest." Id. (emphasis in original). "RLUIPA is to be construed broadly in favor

of protecting an inmate's right to exercise his religious beliefs." Id.

Plaintiff has not set forth any facts to show that the defendants substantially burdened the

exercise of his religious beliefs. Plaintiff's claims regarding his inability to receive religious

publications from the publisher(s) of his choice do not show a substantial burden on the exercise

of his religious belief. Plaintiff also has not set forth sufficient facts linking actions or omissions

of named defendants to the alleged violation of his rights under RLUIPA. Thus, he has not stated

a claim for violation of RLUIPA.

> 4.    Freedom From Retaliation

Allegations of retaliation against a prisoner's First Amendment rights to speech or to

petition the government may support a section 1983 claim. Rizzo v. Dawson, 778 F.2d 527, 532

(9th Cir. 1985); see also Valandingham v. Bojorquez, 866 F.2d 1135 (9th Cir. 1989); Pratt v.

Rowland, 65 F.3d 802, 807 (9th Cir. 1995). "Within the prison context, a viable claim of First

Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some

adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that

such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did

not reasonably advance a legitimate correctional goal." Rhodes v. Robinson, 408 F.3d 559, 567-

68 (9th Cir. 2005). An allegation of retaliation against a prisoner's First Amendment right to file

a prison grievance is sufficient to support a claim under section 1983. Bruce v. Ylst, 351 F.3d

1283, 1288 (9th Cir. 2003). Adverse action is action that "would chill a person of ordinary

firmness" from engaging in that activity. <u>Pinard v. Clatskanie School Dist.</u>, 467 F.3d 755, 770 (9th Cir. 2006); <u>White v. Lee</u>, 227 F.3d 1214, 1228 (9th Cir. 2000); <u>see also</u> <u>Lewis v. Jacks</u>, 486 F.3d 1025 (8th Cir. 2007); <u>see also</u> <u>Thomas v. Eby</u>, 481 F.3d 434, 440 (6th Cir. 2007); <u>Bennett v. Hendrix</u>, 423 F.3d 1247, 1250-51 (11th Cir. 2005); <u>Constantine v. Rectors & Visitors of George Mason Univ.</u>, 411 F.3d 474, 500 (4th Cir. 2005); <u>Gill v. Pidlypchak</u>, 389 F.3d 379, 381 (2d Cir. 2004); <u>Rauser v. Horn</u>, 241 F.3d 330, 333 (3d Cir. 2001). Both litigation in court and filing inmate grievances are protected activities and it is impermissible for prison officials to retaliate against inmates for engaging in these activities. However, not every allegedly adverse action will be sufficient to support a claim under section 1983 for retaliation. In the prison context, cases in this Circuit addressing First Amendment retaliation claims involve situations where the action taken by the defendant was clearly adverse to the plaintiff. <u>Rhodes</u>, 408 F.3d at 568 (arbitrary confiscation and destruction of property, initiation of a prison transfer, and assault in retaliation for filing grievances); <u>Austin</u>, 367 F.3d at 1171 (retaliatory placement in administrative segregation for filing grievances); <u>Bruce</u>, 351 F.3d at 1288 (retaliatory validation as a gang member for filing grievances); <u>Hines v. Gomez</u>, 108 F.3d 265, 267(9th Cir. 1997) (retaliatory issuance of false rules violation and subsequent finding of guilt); <u>Pratt</u>, 65 F.3d at 806 (retaliatory prison transfer and double-cell status); <u>Valandingham</u>, 866 F.2d at 1138 (inmate labeled a snitch and approached by other inmates and threatened with harm as a result); <u>Rizzo</u>, 778 F.2d at 530-32 (retaliatory reassignment out of vocational class and transfer to a different prison).

Plaintiff alleges that (after he filed a notice of enemy concerns/staff misconduct against Figueroa) Figueroa: (1) allowed inmate Morales to read plaintiff's confidential legal papers against Figueroa; (2) directed inmate Morales to make threats to plaintiff that inmate Morales would make life hard on plaintiff's family in Old Broderick (part of West Sacramento where plaintiff and inmate Morales are from) unless plaintiff ceased pursuing legal action regarding the conditions at the facility; and (3) caused verbal abuse and threats of violence against plaintiff from other Hispanic inmates who sided with Figueroa based on ethnic origin. Plaintiff alleges that he contacted "defendants" about these actions and they failed to act. Plaintiff further alleges that this was over familiarity and retaliation by Figueroa and "the other named defendants." Doc.

31, pp. 32, 35-37. This is a cognizable retaliation claim against Figueroa. However, plaintiff fails to link specific actions to the persons he addresses as "defendants" and "the other named defendants" such that his retaliation claim against these amorphous groups of defendants based on the facts discussed in this paragraph fail.

Plaintiff has stated additional valid retaliation claims against a number of defendants in this case. All of plaintiff's retaliation claims were allegedly precipitated by his filing prisoner grievances/appeals against prison staff. Thereafter, various defendants engaged in activities attempting to chill plaintiff's activity without advancing any legitimate penological goal(s). The specific allegations as to each defendant's retaliatory action(s) will be discussed herein below under the applicable topic.

     5.    <u>Safety/Failure to Protect</u>

"Prison officials have a duty to take reasonable steps to protect inmates from physical abuse." <u>Hoptowit v. Ray</u> 682 F.2d 1237, 1250-51 (9th Cir. 1982); see also <u>Farmer v. Brennan</u> 511 U.S. 825, 833 (1994).

To establish a violation of this duty, the prisoner must establish that prison officials were "deliberately indifferent" to serious threats to the inmate's safety. See <u>Farmer</u>, 511 U.S. at 834. To demonstrate that a prison official was deliberately indifferent to a serious threat to the inmate's safety, the prisoner must show that "the official [knew] of and disregard[ed] an excessive risk to inmate ... safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [the official] must also draw the inference." <u>Farmer</u>, 511 U.S. at 837; <u>Anderson v. County of Kern</u>, 45 F.3d 1310, 1313 (9th Cir. 1995). To prove knowledge of the risk, however, the prisoner may rely on circumstantial evidence; in fact, the very obviousness of the risk may be sufficient to establish knowledge. <u>Farmer</u>, 511 U.S. at 842; <u>Wallis v. Baldwin</u>, 70 F.3d 1074, 1077 (9th Cir. 1995).

To grant injunctive relief concerning serious risks to the inmate's safety, the court must find that at the time the relief will be granted there is still a serious, present risk to the inmate and that the prison officials are still acting with deliberate indifference to that risk. <u>Farmer</u>, 511 U.S.

///

at 845-47; see also <u>Helling v. McKinney</u> 509 U.S. 25, 35-36 (1993) (discussing injunctive relief where there is a threat of harm to inmate's health).

The Ninth Circuit has held that placing a pre-operative transsexual, who acts and dresses effeminately, in the prison's general population evidenced of deliberate indifference to an inmate's safety. <u>Farmer</u>, 511 U.S. at 848-49; cf. <u>Redman v. County of San Diego</u>, 942 F.2 1435, 1444-45 (9th Cir. 1991)(en banc)(concluding that placing a young pre-trial detainee in a cell with a known aggressive sexual offender was deliberate indifference to the detainee's safety). Allegations that a defendant placed an "R-suffix" (indicating inmate is a sexual offender) in an inmate's file, knowing that the inmate would be stabbed if he was subsequently placed into the general population are sufficient to show that the defendant had knowledge of a risk to plaintiff's safety. See <u>Knight v. Runnels</u> No. CIV S-07-0751-FCD-CMK-P (E.D. Cal. Filed Aug. 20, 2007). The Ninth Circuit has also held that allegations that prison officials called a prisoner a "snitch" in the presence of other inmates were sufficient to state a claim of deliberate indifference to an inmate's safety. See <u>Valandingham v. Bojorquez</u>, 866 F.2d 1135, 1139 (9th Cir. 1989). But see <u>Morgan v. MacDonald</u> 41 F.3d 1291, 1293-94 (9th Cir. 1994)(rejecting Eighth Amendment claim where prisoner who had been labeled a snitch had not been retaliated against).

Plaintiff, a disabled Level III sex offender inmate, alleges that Cobbs and Diaz retaliated against him by keeping him at a Level IV facility, and placing him in a cell with an inmate who was known to be very violent and had recently murdered another inmate. Thus, plaintiff's allegations are sufficient to state cognizable claims for deliberate indifference to plaintiff's safety against Cobbs and Diaz.

### 6. <u>Conditions of Confinement</u>

To constitute cruel and unusual punishment in violation of the Eighth Amendment, prison conditions must involve "the wanton and unnecessary infliction of pain . . . ." <u>Rhodes v. Chapman</u>, 452 U.S. 337, 347 (1981). Although prison conditions may be restrictive and harsh, prison officials must provide prisoners with food, clothing, shelter, sanitation, medical care, and personal safety. <u>Id</u>.; <u>Toussaint v. McCarthy</u>, 801 F.2d 1080, 1107 (9th Cir. 1986); <u>Hoptowit v.</u>

9

Ray, 682 F.2d 1237, 1246 (9th Cir. 1982). Where a prisoner alleges injuries stemming from unsafe conditions of confinement, prison officials may be held liable only if they acted with "deliberate indifference to a substantial risk of serious harm." Frost v. Agnos, 152 F.3d 1124, 1128 (9th Cir. 1998).

The deliberate indifference standard involves an objective and a subjective prong. First, the alleged deprivation must be, in objective terms, "sufficiently serious . . . ." Farmer v. Brennan, 511 U.S. 825, 834 (1994) (citing Wilson v. Seiter, 501 U.S. 294, 298 (1991)). Second, the prison official must "know[] of and disregard[] an excessive risk to inmate health or safety . . . ." Farmer, 511 U.S. at 837. Thus, a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of harm and disregards that risk by failing to take reasonable measures to abate it. Id. at 837-45. "[E]xtreme deprivations are required to make out a[n] [Eighth Amendment] conditions-of-confinement claim." Hudson v. McMillian, 503 U.S. 1, 9 (1992) (citation omitted). With respect to this type of claim, "[b]ecause routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." Id. (quotations and citations omitted).

Plaintiff's allegation that defendant Santa Cruz refused to honor the medical order for in-cell food trays, and that he could pick up and carry his own tray from the dining hall (which plaintiff was not able to do due to his cane, back brace, and difficulty walking) or starve, he did not care, and that plaintiff did go without food, is sufficient to show that Santa Cruz was deliberately indifferent to plaintiff's need for food and to be fed in his cell due to his medical conditions. Doc. 31, 18-19.

Plaintiff further states a valid claim for conditions of confinement and retaliation against Santa Cruz for Santa Cruz ordering medical change to chrono from 6 months to 1 month in retaliation for plaintiff's filing a 602 administrative appeal against Santa Cruz for not receiving his food trays in his cell as Klarich had ordered. Doc. 31, pg. 19.

///

10

Likewise, plaintiff states a valid conditions of confinement claim against Barnerio for waiting 3 months before issuing (and then backdated) the chrono regarding Klarich's medical order for in-cell food trays. Doc. 31, pg. 39.

Further, plaintiff states a valid conditions of confinement claim against Santa Cruz and Cobbs interception of Barnerio's chrono regarding Klarich's medical order for in-cell food trays in willful interference and cancelling Klarich's order. Doc. 31, pg. 39-40.

### 7. Medical Needs

To constitute cruel and unusual punishment in violation of the Eighth Amendment, prison conditions must involve "the wanton and unnecessary infliction of pain." Rhodes v. Chapman, 452 U.S. 337, 347 (1981). A prisoner's claim of inadequate medical care does not rise to the level of an Eighth Amendment violation unless (1) "the prison official deprived the prisoner of the 'minimal civilized measure of life's necessities,'" and (2) "the prison official 'acted with deliberate indifference in doing so.'" Toguchi v. Chung, 391 F.3d 1051, 1057 (9th Cir. 2004) (quoting Hallett v. Morgan, 296 F.3d 732, 744 (9th Cir. 2002) (citation omitted)). A prison official does not act in a deliberately indifferent manner unless the official "knows of and disregards an excessive risk to inmate health or safety." Farmer v. Brennan, 511 U.S. 825, 834 (1994). Deliberate indifference may be manifested "when prison officials deny, delay or intentionally interfere with medical treatment," or in the manner "in which prison physicians provide medical care." McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX Techs., Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc). Where a prisoner is alleging a delay in receiving medical treatment, the delay must have led to further harm in order for the prisoner to make a claim of deliberate indifference to serious medical needs. McGuckin, 974 F.2d at 1060 (citing Shapely v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985)).

As to Dr. Klarich, plaintiff alleges that he submitted to Dr. Klarich over a period of almost two years, and that he presented with obvious indicators of end stage liver disease, respiratory distress, COPD w/emphysema, seizure disorder, spinal disease, and GI disease. Plaintiff alleges that Dr. Klarich: (1) knew of plaintiff's high ammonia levels and mental

11

confusion, yet intentionally disregarded the severity of plaintiff's medical status ("obvious destruction of brain and organ tissue") and only prescribed medical cell feedings and over the counter Ibuprofen, causing organ damage and brain cell death; (2) knew of plaintiff's respiratory distress symptoms of suffocation and black-outs, and yet failed to treat plaintiff or prescribe a chest x-ray and breathing treatments; (3) knew of plaintiff's degenerative spinal and facet disease, arthritis, bone spurring and the fact that plaintiff was in obvious acute distress from pain, yet only prescribed over the counter Ibuprofen for pain, knowing that this would leave plaintiff in severe pain at all times. Doc. 31, pp. 15-18. These allegations are sufficient to state a cognizable claim against Dr. Klarich for deliberate indifference to plaintiff's serious medical needs.

Plaintiff alleges that he submitted to Dr. Nyguen for slightly over a year, and that he presented with obvious indicators of end stage liver disease, and respiratory distress, COPD w/emphysema, seizure disorder, spinal disease, and GI disease. Plaintiff alleges that Dr. Nyguen: (1) knew of plaintiff's high ammonia levels and mental confusion, yet intentionally disregarded the severity of plaintiff's medical status ("mental confusion presentation [end stage liver failure indicator]") and only prescribed over the counter antacids and routine blood work for GI conditions, causing organ damage and brain cell death; (2) knew of plaintiff's respiratory distress symptoms and yet failed to treat plaintiff, prescribe a chest x-ray or breathing treatments thus causing oxygen deprivation and blackouts; (3) knew of plaintiff's degenerative spinal and facet disease, arthritis, bone spurring and the fact that plaintiff was in obvious acute distress from pain, yet only prescribed over the counter Ibuprofen for pain, knowing that this would leave plaintiff in severe pain at all times. Doc. 31, pp. 20-22. Plaintiff alleges that on July 18, 2003, he was seen by Dr. Nyguen to review: the GI specialist's report; revisit wheelchair use; pain management plan; medically disabled status; pain management via extra mattress/pillow chrono; and appointments with orthopedic physician, dietician, and pain management clinic. Plaintiff alleges Dr. Nyguen refused to look at any specialist reports, said routine blood work was acceptable, forced plaintiff to leave, verbally assaulted plaintiff, and told plaintiff to file a 602 inmate appeal again. Dr. Nyguen also allowed plaintiff's anti-seizure medications to expire and did not renew them for weeks. Plaintiff further alleges that a month later, he presented to Dr. Nyguen for

renewal of his medications, but that Dr. Nyguen refused to see plaintiff until September 15, 2003, when he saw plaintiff for being bedridden due to excessive illnesses secondary to his prescription of Rebetol.  Dr. Nyguen verbally berated plaintiff, and sent him away without medical care despite plaintiff's blood toxicity being past maximum safe levels and showing extra high ammonia levels that were destroying plaintiff's mental functions and internal organs.  Doc. 31, pg. 45-46.  Plaintiff also alleges that on October 17, 2003, Dr. Nyguen renewed some of his medications (ignoring others), verbally berated plaintiff in retaliation for filing inmate appeals against him, and refused to discuss any specialists reports or referrals.  Doc. 31, pg. 48.  These allegations are sufficient to state a cognizable claim against Dr. Nyguen for deliberate indifference to plaintiff's serious medical needs and for retaliation for filing grievances in the past.  However, plaintiff's claim that Dr. Nyguen verbally assaulted him is not sufficient to state a constitutional deprivation under 42 U.S.C. § 1983, Oltarzewski v. Ruggiero, 830 F.2d 136, 139 (9th Cir. 1987).

Plaintiff alleges that he submitted to Dr. Deering for slightly over a year, and that he presented with obvious indicators of end stage liver disease, and respiratory distress, COPD w/emphysema, seizure disorder, spinal disease, and GI disease.  Plaintiff alleges that Dr. Deering: (1) knew of plaintiff's high ammonia levels and mental confusion, yet intentionally disregarded the severity of plaintiff's medical status ("mental confusion presentation [end stage liver failure indicator]") and only prescribed over the counter antacids; (2) knew of plaintiff's respiratory distress symptoms and yet failed to treat plaintiff, prescribe a chest x-ray or breathing treatments thus causing oxygen deprivation, blackouts, organ damage and brain cell death; (3) knew of plaintiff's degenerative spinal and facet disease, arthritis, bone spurring and the fact that plaintiff was in obvious acute distress from pain, yet only prescribed over the counter Ibuprofen for pain, knowing that this would leave plaintiff in severe pain at all times.  Doc. 31, pp. 22-24.  These allegations are sufficient to state a cognizable claim against Dr. Deering for deliberate indifference to plaintiff's serious medical needs.

Plaintiff alleges that he submitted to Dr. Wu for slightly over a year, and that he presented with obvious indicators of end stage liver disease, and respiratory distress, COPD w/emphysema,

seizure disorder, spinal disease, and GI disease. Plaintiff alleges that Dr. Wu: (1) knew of

plaintiff's high ammonia levels and mental confusion, yet intentionally disregarded the severity

of plaintiff's medical status ("mental confusion presentation [end stage liver failure indicator]")

and only prescribed medical cell feedings and over the counter antacids; (2) knew of plaintiff's

respiratory distress symptoms and yet failed to treat plaintiff, prescribe a chest x-ray or breathing

treatments thus causing oxygen deprivation, blackouts, organ damage, brain cell death, and

distress for weeks similar to slow suffocation; (3) knew of plaintiff's degenerative spinal and

facet disease, arthritis, bone spurring and the fact that plaintiff was in obvious acute distress from

pain, yet only prescribed over the counter Ibuprofen for pain, knowing that this would leave

plaintiff in severe pain at all times. Doc. 31, pp. 24-26. Further, plaintiff alleges that on April

23, 2003, Dr. Wu saw plaintiff: (1) knew that he was in severe pain, acknowledged that hard steel

bunks were aggravating his pain from bulging discs, spinal disease, and arthritis, yet denied

plaintiff an extra mattress and pillow for pain management; (2) confirmed carpal tunnel

syndrome and arthritis in both hands, but refused to issue wrist braces for pain, "nor medically

unassigned status;" and (3) when plaintiff requested Dr. Wu check on appointments with

specialists that were more than a year overdue, in retaliation, Dr. Wu pushed plaintiff out of his

office and told plaintiff to file a grievance on him, since plaintiff was so good at it. Doc. 31, pg.

42-43. These allegations are sufficient to state a cognizable claim against Dr. Wu for deliberate

indifference to plaintiff's serious medical needs and for retaliation.

Plaintiff alleges that, on May 15, 2005, Dr. Peneda performed a cursory exam; called and

spoke with Bhatt, Nyguen, Wu, and Adams to ascertain what they wanted his report to say; and

thereafter issued a report stating no medical treatment was needed so that "other defendants"

could use his report to deny plaintiff referrals and pain management. Plaintiff alleges that Dr.

Peneda conspired with "CDCR Officials" (to rebut CDCR's neurosurgeon's report ordering

immediate use of a wheelchair, extra mattress and pillows for spinal disease, permanently

unassigned status, chronic pain management with Vicodin and epidural injections) in retaliation

against plaintiff for seeking redress and medical care. Doc. 31, pp. 43-44. These allegations do

not rise to the level of a cognizable claim for deliberate indifference to plaintiff's serious medical

needs as plaintiff failed to allege that Dr. Peneda knew of and disregarded an excessive risk to inmate health or safety. <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994). Nor is this sufficient to state a claim against Dr. Peneda for conspiracy. See I.B.11.a.&b.

Plaintiff alleges that Doe pharmacy staff knew the necessity and nature of medications the doctors had prescribed for him (Tegratol & Neurontin for control of grand mal seizures; Azmacort, Antrovent & Albuterol for emphysema, asthma, and bronchitis; and Reglan & Prilosec for severe GI problems) but ignored the physician's orders in deliberate indifference to plaintiff's serious medical needs. In this instance, plaintiff does not state how the pharmacy staff "ignored" the doctors' prescriptions – i.e. whether they refused to fill the scripts, or dispensed the wrong medications or dosages, etc. Plaintiff also does not state what, if any, injuries he sustained as a result of the Doe pharmacy staff ignoring the doctors' prescriptions. Doc. 31, pg. 27. Plaintiff subsequently makes further allegations against Doe pharmacy staff for taking no action to get plaintiff his anti-seizure medication and failed to timely schedule a follow-up as ordered by Dr. White. However, plaintiff again fails to allege what, if any, injuries he sustained because of this inaction by Doe pharmacy staff. Doc. 31, pp. 37-38. While plaintiff alleges a delay in receiving medical treatment, he failed to allege that the delay led to further harm in order for the prisoner to make a claim of deliberate indifference to serious medical needs. <u>McGuckin</u>, 974 F.2d at 1060 (citing <u>Shapely v. Nevada Bd. of State Prison Comm'rs</u>, 766 F.2d 404, 407 (9th Cir. 1985)). Thus, plaintiff has not stated a cognizable claim against Doe pharmacy staff for deliberate indifference to his serious medical needs.

Plaintiff further alleges that he saw Overly who was deliberately indifferent to plaintiff's medical needs, and verbally harassed and chastised plaintiff for filing an inmate appeal on the issue of not receiving the medications and timely follow-up as ordered by Dr. White. Doc. 31., 38-39. While plaintiff alleges Overly caused a delay in receiving medical treatment, he failed to allege that the delay led to further harm in order for the prisoner to make a claim of deliberate indifference to serious medical needs. <u>McGuckin</u>, 974 F.2d at 1060 (citing <u>Shapely v. Nevada Bd. of State Prison Comm'rs</u>, 766 F.2d 404, 407 (9th Cir. 1985)). Further, plaintiff's claims that Overly harassed and chastised him is not sufficient to state a constitutional deprivation under 42

15

U.S.C. § 1983, <u>Oltarzewski v. Ruggiero</u>, 830 F.2d 136, 139 (9th Cir. 1987), and threats do not rise to the level of a constitutional violation. <u>Gaut v. Sunn</u>, 810 F.2d 923, 925 (9th Cir. 1987). However, this is a cognizable claim for retaliation against Overly.

Plaintiff's allegation, at Doc. 31, 18-19, that Santa Cruz refused to honor Klarich's medical order for in-cell food trays is insufficient to rise to the level of an Eighth Amendment violation for deliberate indifference to his serious medical needs. Plaintiff has not alleged facts supporting a claim that defendant Santa Cruz "[knew] of and disregard[ed] an excessive risk to [plaintiff's] health . . . ." <u>Farmer</u>, 511 U.S. at 837. However, these allegations against Santa Cruz do state a cognizable claim for the condition of his confinement. See I.B.6.

Plaintiff's allegation, at Doc. 31, pg. 39, that Barnerio waited 3 months before issuing (and then backdated) the chrono regarding Klarich's medical order for in-cell food trays is insufficient to rise to the level of an Eighth Amendment violation for deliberate indifference to his serious medical needs. Plaintiff has not alleged facts supporting a claim that defendant Barnerio "[knew] of and disregard[ed] an excessive risk to [plaintiff's] health . . . ." <u>Farmer</u>, 511 U.S. at 837. Doc. 31, pg. 39. However, these allegations against Barnerio do state a cognizable claim for the condition of his confinement. See I.B.6.

Plaintiff's allegation, at Doc. 31, pg. 39-40, that Santa Cruz and Cobbs intercepted Barnerio's chrono regarding Klarich's medical order for in-cell food trays in willful interference and cancelling Klarich's order is insufficient to rise to the level of an Eighth Amendment violation for deliberate indifference to his serious medical needs. Plaintiff has not alleged facts supporting a claim that Santa Cruz and Cobbs "[knew] of and disregard[ed] an excessive risk to [plaintiff's] health . . . ." <u>Farmer</u>, 511 U.S. at 837. Doc. 31, pp. 39-40. However, these allegations do state cognizable claims against Santa Cruz and Cobbs for the condition of his confinement. See I.B.6.

Plaintiff alleges that McCant and Bhatt were deliberately indifferent to his serious medical needs based on their refusing to correct the policy/egregious voids in the system as illuminated by the handling of Klarich's order for in cell feedings. Doc. 31, pg. 40. Plaintiff has not alleged facts supporting a claim that McCant and/or Bhatt "[knew] of and disregard[ed] an

excessive risk to [plaintiff's] health . . . ." <u>Farmer</u>, 511 U.S. at 837.  However, these allegations do state a cognizable claim against McCant for failing to correct/recommend changes and against Bhatt as the "chief policy maker" regarding the handling of medical orders by prison staff.  See I.B.16.

Plaintiff alleges that Schwarzenegger, Alemedia, Bhatt and Adams had "first hand involvement" in the deliberate indifference as to his serious medical needs based on contacts they received from The Prison Law Offices and Jeff Dicks Society.  Doc. 31, pg. 41.  Plaintiff has not alleged facts supporting a claim that Schwarzenegger, Alemedia, Bhatt and Adams "[knew] of and disregard[ed] an excessive risk to [plaintiff's] health . . . ." <u>Farmer</u>, 511 U.S. at 837.

Plaintiff also alleges that Wessel was contacted by the Jeff Dicks Society on August 28, 2003 and that Wessel referred the issue back to Nyguen and Bhatt and thereafter took no action. Doc. 31, pg. 49.  This is insufficient to show that Wessel "[knew] of and disregard[ed] an excessive risk to [plaintiff's] health . . . ." <u>Farmer</u>, 511 U.S. at 837.

Further, plaintiff's allegations that Schwarzenegger is liable for underfunding prison medical care likewise is not sufficient to show that Schwarzenegger "[knew] of and disregard[ed] an excessive risk to [plaintiff's] health . . . ." <u>Farmer</u>, 511 U.S. at 837.

### 8. <u>Equal Protection</u>

Plaintiff appears to allege that defendants' denial of religious publications via mail violates the Equal Protection Clause.  "The Equal Protection Clause . . . is essentially a direction that all persons similarly situated should be treated alike." <u>City of Cleburne v. Cleburne Living Ctr., Inc.</u>, 473 U.S. 432 (1985) (citing <u>Plyler v. Doe</u>, 457 U.S. 202, 216 (1982)).  "'To state a claim under 42 U.S.C. § 1983 for a violation of the Equal Protection Clause of the Fourteenth Amendment a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class.'" <u>Lee v. City of Los Angeles</u>, 250 F.3d 668, 686 (9th Cir. 2001) (quoting <u>Barren v. Harrington</u>, 152 F.3d 1193, 1194 (9th Cir. 1998)).  "Intentional discrimination means that a defendant acted at least in part *because of* a plaintiff's protected status." <u>Serrano v. Francis</u>, 345 F.3d 1071, 1082 (9th Cir. 2003) (quoting <u>Maynard v. City of San Jose</u>, 37 F.3d 1396, 1404 (9th Cir. 1994)) (emphasis in

17

original).  "Where the challenged governmental policy is 'facially neural,' proof of its disproportionate impact on an identifiable group can satisfy the intent requirement only if it tends to show that some invidious or discriminatory purpose underlies the policy."  Lee, 250 F.3d at 687 (citing Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252 (264-66) (1977) (internal citations omitted)).  "The mere fact that [a] facially neutral polic[y] had a foreseeable disproportionate impact on an identifiable group does not mean that [it] violated the Equal Protection Clause."  Id. at 687.

Plaintiff's equal protection claims appear to relate solely to his claim(s) regarding his inability to receive religious publications from publishers of his choice which were previously determined to be defective as discussed at I.B.2.b. herein above.  Other than his claims regarding receipt of religious publications, plaintiff has set forth no facts that support a claim that he was intentionally discriminated against on the basis of being a Seventh Day Adventist.  Thus, plaintiff has failed to state a claim for violation of his rights under the Equal Protection Clause against defendants Adams, Alemedia, Gomez, Grannis, and "Schwarzenegger, et al."

9.    Due Process

a.    Procedural

The Due Process Clause protects prisoners from being deprived of life, liberty, or property without due process of law.  Wolff v. McDonnell, 418 U.S. 539, 556 (1974).  In order to state a cause of action for deprivation of due process, a plaintiff must first establish the existence of a liberty interest for which the protection is sought.  "States may under certain circumstances create liberty interests which are protected by the Due Process Clause."  Sandin v. Conner, 515 U.S. 472, 483-84 (1995).  Liberty interests created by state law are generally limited to freedom from restraint which "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  Sandin, 515 U.S. at 484.

"[A prison] grievance procedure is a procedural right only, it does not confer any substantive right upon the inmates."  Buckley v. Barlow, 997 F.2d 494, 495 (8th Cir. 1993) (citing Azeez v. DeRobertis, 568 F. Supp. 8, 10 (N.D. Ill. 1982)); see also Ramirez v. Galaza, 334 F.3d 850, 860 (9th Cir. 2003) (no liberty interest in processing of appeals because no

18

entitlement to a specific grievance procedure); <u>Massey v. Helman</u>, 259 F.3d 641, 647 (7th Cir. 2001) (existence of grievance procedure confers no liberty interest on prisoner); <u>Mann v. Adams</u>, 855 F.2d 639, 640 (9th Cir. 1988). "Hence, it does not give rise to a protected liberty interest requiring the procedural protections envisioned by the Fourteenth Amendment." <u>Azeez v. DeRobertis</u>, 568 F. Supp. at 10; <u>Spencer v. Moore</u>, 638 F. Supp. 315, 316 (E.D. Mo. 1986). Actions in reviewing prisoner's administrative appeal cannot serve as the basis for liability under a § 1983 action. <u>Buckley</u>, 997 F.2d at 495.

Plaintiff alleges that:

(1)   Grannis denied his class action appeal based on lack of documentation (CDC 1819 Denied Publications form), yet ignored the basis of the appeal being denial of publications "'[w]ithout notice of due process protections.'" Doc. 31, pg. 60.

(2)   F.S. Cotes, D. Duvall, D. Adams, L.L. Rianda, and N. Grannis had duties to respond to and investigate plaintiff's appeals; knew he was in danger; and "chose to ignore facts easily verified." Doc. 31, pp. 12-13.

(3)   Barbiro, Allison, McCant, Cotes, Appelbaum, Duvall, Arline, Aguillerra-Morreno, and Overly failed to investigate why plaintiff was not getting his prescribed medications when plaintiff contacted them. Doc. 13, pp. 27-28.

Denial and/or negative findings of plaintiff's prisoner's administrative appeal cannot serve as the basis for liability under a § 1983 action. <u>Buckley</u>, 997 F.2d at 495. Thus, plaintiff has failed to state cognizable claims against Grannis, Cotes, Duvall, Adams, Rianda, Barbiro, Allison, McCant, Appelbaum, Arline, Aguillerra-Morreno, and Overly regarding their involvement in reviewing his administrative appeals/grievances.

b.   <u>Substantive    </u>

"To establish a violation of substantive due process . . . , a plaintiff is ordinarily required to prove that a challenged government action was clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare. Where a particular amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due

19

process, must be the guide for analyzing a plaintiff's claims." Patel v. Penman, 103 F.3d 868, 874 (9th Cir. 1996) (citations, internal quotations, and brackets omitted), *cert. denied*, 117 S. Ct. 1845 (1997); County of Sacramento v. Lewis, 523 U.S. 833, 842 (1998). Plaintiff has not alleged any facts that would support a claim that his rights under the substantive component of the Due Process Clause were violated.

### 10. Access to Court Claims

Inmates have a fundamental constitutional right of access to the courts. Lewis v. Casey, 518 U.S. 343, 346 (1996). The right of access is merely the right to bring to court a grievance the inmate wishes to present, and is limited to direct criminal appeals, habeas petitions, and civil rights actions. Id. at 354. An inmate claiming interference with or denial of access to the courts must show that he suffered an actual injury. Id.

Claims for denial of access to the courts may arise from the frustration or hindrance of "a litigating opportunity yet to be gained" (forward-looking access claim) or from the loss of a meritorious suit that cannot now be tried (backward-looking claim). Christopher v. Harbury, 536 U.S. 403, 412-15, 122 S.Ct. 2179, 2185-87 (2002). For backward-looking claims such as that at issue here, plaintiff "must show: 1) the loss of a 'nonfrivolous' or 'arguable' underlying claim; 2) the official acts frustrating the litigation; and 3) a remedy that may be awarded as recompense but that is not otherwise available in a future suit." Phillips v. Hust, 477 F.3d 1070, 1076 (9th Cir. 2007).

The first element requires that plaintiff show he suffered an "actual injury" by being shut out of court. Harbury 536 U.S. at 415, 121 S.Ct. at 2187; Lewis, 518 U.S. at 351, 116 S.Ct. at 2180; Phillips, 477 F.3d at 1076. The second element requires that plaintiff show that each involved defendant proximately caused the alleged violation of plaintiff's rights, "[t]he touchstone . . . [for which] is foreseeability." Phillips, 477 F.3d at 1077. Finally, the third element requires that plaintiff show he has no other remedy than the relief available via *this* suit for denial of access to the courts. Id. at 1078-79.

A number of courts have declined to dismiss for failure to exhaust where prison officials have rendered the process itself unavailable, either through the failure to respond in a timely

manner or through the failure to respond at all.  <u>Jernigan v. Stuchell</u>, 304 F.3d 1030, 1032 (10th Cir. 2002) (the failure to respond to a grievance within the policy time limits renders remedy unavailable); <u>Lewis v. Washington</u>, 300 F.3d 829, 833 (7th Cir. 2002) (when prison officials fail to respond, the remedy becomes unavailable, and exhaustion occurs); <u>Foulk v. Charrier</u>, 262 F.3d 687, 698 (8th Cir. 2001) (district court did not err when it declined to dismiss claim for failure to exhaust where prison failed to respond to grievance); <u>Powe v. Ennis</u>, 177 F.3d 393, 394 (5th Cir. 1999) (when a valid grievance has been filed and the state's time for responding has expired, the remedies are deemed exhausted); <u>Underwood v. Wilson</u>, 151 F.3d 292, 295 (5th Cir. 1998) (when time limit for prison's response has expired, the remedies are exhausted); <u>see</u> <u>also</u> <u>Mitchell v. Horn</u>, 318 F.3d 523, 529 (3d Cir. 2003) (recognizing that a remedy prison officials prevent a prisoner from utilizing is not an available remedy); <u>Brown v. Croak</u>, 312 F.3d 109, 113 (3d Cir. 2002) (formal grievance procedure not available where prison officials told prisoner to wait for termination of investigation before filing formal grievance and then never informed prisoner of termination of investigation); <u>Miller v. Norris</u>, 247 F.3d 736, 740 (8th Cir. 2001) (a remedy prison officials prevent a prisoner from utilizing is not an available remedy).  In joining the Eighth and Fifth Circuits with respect to this issue, the Seventh Circuit Court stated that it "refuse[d] to interpret the PLRA 'so narrowly as to . . . permit [prison officials] to exploit the exhaustion requirement through indefinite delay in responding to the grievances.'"  <u>Lewis v. Washington</u>, 300 F.3d 829, 833 (7th Cir. 2002) (citing <u>Goodman v. Carter</u>, No. 2000 C 948, 2001 WL 755137, at *3 (N.D.Ill. July 2, 2001)).

Plaintiff claims that: (1) Cotes, Duvall, Adams, Rianda, and Grannis have met and designed a policy and procedure of "calculated loss, destruction, denial of plaintiff's appeals" to stifle his filing inmate appeals and to delay exhaustion of his administrative remedies;  (2) Barbiro, Allison, McCant, Cotes, Appelbaum, Duvall, Arline, Aguillerra-Morreno, and Overly set up a policy of stalling, delaying, or totally losing inmate appeals regarding medications/medical issues to prevent exhaustion of administrative remedies in retaliation against plaintiff to prevent him from having access to the courts, and to inflict suffering and/or lingering death on plaintiff; (3) that Cotes refused to log inmate appeals or grievances in retaliation for plaintiff's petitioning

the courts for redress and to prevent plaintiff from timely bringing constitutional claims before the courts; and (4) that he is in a dependent fiduciary relationship with "defendants" and that a wrong continues to occur based on "defendants" delay in processing and/or preparing findings regarding his various prisoner grievances/appeals.  Doc. 31, pp. 11-13, 28-29, 32-33, & 49-50.

Per the cases sited in this section, it is not a foregone conclusion that plaintiff will ultimately suffer dismissal because his appeals have been delayed or have otherwise gone unanswered.  Until plaintiff suffers some actual prejudice with respect to his suits and this prejudice results from prison officials' failure to respond to his appeals, plaintiff has not suffered an actual injury.  Plaintiff has failed to allege cognizable claims for interference with his access to the courts claims stemming from the inadequacies of the inmate appeals process.

a.      Law Library

Woven into plaintiff's claims based on denial of access to the courts are claims that the proposal by Schwarzenegger and Alemedia to install one computer terminal with limited access for every 500 inmates is inadequate.  Doc. 31, pg. 31.

Inmates do not have the right to a law library or legal assistance.  Lewis, 518 U.S. at 351.  Law libraries and legal assistance programs are only the means of ensuring access to the courts.  Id.  Because inmates do not have "an abstract, freestanding right to a law library or legal assistance, an inmate cannot establish relevant actual injury by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense."  Id.  Rather, an inmate claiming interference with or denial of access to the courts must show that he suffered an actual injury.  Id.

Plaintiff does not have the right to a law library or legal assistance.  Therefore, his claims against Schwarzenegger and Alemedia fail to state a cognizable claim.

Further, plaintiff claims that, because of the inadequate law library available to him, he was prevented from suing the Roman Catholic Church and/or Archbishop for being a victim of childhood clergy sexual abuse in the open revival period provided for by California Code of Civil Procedure § 340.1.  Plaintiff further claims that, had he had access to "a constitutionally minimal prison law library," he would have received a settlement in the millions of dollars.  Plaintiff

22

claims that Figueroa, Zimmerman, Bollard, Ward, Duvall, Adams, Sanchez, Yates, Cobbs, Dahlberg, Grannis, Alemedia, and Schwarzenegger are responsible for the inadequacy of the law library so as to prevent him from having access to the courts. Doc. 31, pp. 29-31. However, plaintiff's claim for childhood clergy sexual abuse is not a direct criminal appeal, habeas petition, or civil rights action. Lewis v. Casey, 518 U.S. 343, 354 (1996). Therefore, plaintiff's claims as to being denied access to the courts for regarding his claim for childhood clergy sexual abuse, based on the inadequacy of the law library are not cognizable.

 11. Conspiracy

 a. 42 U.S.C. § 1985(3)

"To state a cause of action under § 1985(3), a complaint must allege (1) a conspiracy, (2) to deprive any person or a class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws, (3) an act by one of the conspirators in furtherance of the conspiracy, and (4) a personal injury, property damage or a deprivation of any right or privilege of a citizen of the United States." Gillespie v. Civiletti 629 F.2d 637, 641 (9th Cir. 1980) (citing Griffin v. Breckenridge, 403 U.S. 88, 102-03 (1971); see also Sever v. Alaska Pulp Corp., 978 F.2d 1529, 1536 (9th Cir. 1992).

"The language requiring intent to deprive of *equal* protection . . . means that there must be some racial, or perhaps otherwise class-based invidiously discriminatory animus behind the conspirators' action." Griffin, 403 U.S. at 102 (emphasis added); see also Sever, 978 F.2d at 1536. Animus toward union members does not meet the "otherwise class-based" factor of Griffin. See United Bhd. Of Carpenters, Local 610 v. Scott, 463 U.S. 825, 835 (1983). The Supreme Court has declined to address whether gender is an "otherwise class-based" category under § 1985(3). See Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 269 (1993).

The Ninth Circuit has extended § 1985(3) "beyond race 'only when the class in question can show that there has been a governmental determination that its members "require and warrant special federal assistance in protecting their civil rights."'" Sever, 978 F.2d at 1536. More specifically, [the Ninth Circuit] require[s] 'either that the courts have designated the class in question a suspect or quasi-suspect classification requiring more exacting scrutiny or that

23

Congress has indicated through legislation that the class required special protection.'" Id (quoting Schultz v. Sundberg, 759 F.2d 714, 718 (9th Cir. 1985) (per curiam)); see also Maynard v. City of San Jose, 37 F.3d 1396, 1403 (9th Cir. 1994); McCalden v. California Library Ass'n, 955 F.2d 1214, 1223 (9th Cir. 1990); Canlis v. San Joaquin Sheriff's Posse Comitatus, 641 F.2d 711, 720 (9th Cir. 1981); DeSantis v. Pac. Tel. & Tel. Co., 608 F.2d 327, 333 (9th Cir. 1979).

Plaintiff claims that "all defendants" know that the ban on publications from certain religious groups is unconstitutional and is used purposely to "incite, vex, oppress plaintiff's class to the point of unrest; with the sole purpose to gain greater overtime pay for periods of lock-down. Their personal gain, and recidivism [job security], to the detriment of plaintiff, his class, and Society." Doc. 31, pp. 56-57.

Plaintiff claims that Schwarzenegger, Alemedia, Adams, Grannis, and "Doe defendant policy makers and supervisors" conspired "with their subordinates, to ignore the unconstitutional denial of rights owed to plaintiff. Creating a void of totally unsupervised conditions at all prisons under their policies and commands, statewide." Doc. 31, pg. 60.

Plaintiff alleges that Dr. Peneda conspired with "CDCR Officials" (to rebut CDCR's neurosurgeon's report ordering immediate use of a wheelchair, extra mattress and pillows for spinal disease, permanently unassigned status, chronic pain management with Vicodin and epidural injections) in retaliation against plaintiff for seeking redress and medical care. Doc. 31, pp. 43-44.

Plaintiff alleges that Bhatt, Cotes, and Allison conspired so as to cause plaintiff's inmate appeals against Nyguen to be routed back to Nyguen rather than being investigated and/or otherwise addressed such that no other defendant would be informed of the state of medical care or neglect at the facility to create "premeditated plausible denyability." Doc. 31. pp. 47-48.

Plaintiff also alleges that Wessel was contacted by the Jeff Dicks Society on August 28, 2003 and that Wessel referred the issue back to Nyguen and Bhatt and thereafter took no action. Doc. 31, pg. 49.

Plaintiff has failed to state a cognizable claim under § 1985(3) as he has failed to allege a class-based discriminatory motive by any of the defendants he accuses of conspiring against him.

24

b.    42 U.S.C. § 1986

"Section 1986 authorizes a remedy against state actors who have negligently failed to prevent a conspiracy that would be actionable under § 1985." Cerrato v. San Francisco Cmty. Coll. Dist., 26 F.3d 968, 971, n.7 (9th Cir. 1994). "A claim can be stated under [§] 1986 only if the complaint contains a valid claim under [§] 1985." Karim-Panahi v. Los Angeles Police Dep't, 839 F.2d 621, 626 (9th Cir. 1988); see also McCalden v. California Library Ass'n 955 F.2d 1214, 1223 (9th Cir. 1990); Sanchez v. City of Santa Ana, 936 F.2d 1027, 1040 (9th Cir. 1990). Since plaintiff failed to state a cognizable claim against the defendants under § 1985(3), his claims under § 1986 fail as well.

12.    Property Possession Regulation – Rehabilitation Act & First Amendment Claims

Plaintiff alleges that the regulation restricting inmates to six cubic feet of property in their cell violates his rights under the Rehabilitation Act (RA) because it limits his access to learning material that will allow him to grow and be productive in the world, and violates his rights under the First Amendment because it infringes on his right to own rehabilitative material.

"[Section] 504 of the RA . . . prohibit[s] discrimination on the basis of disability," Lovell v. Chandler, 303 F.3d 1039, 1052 (9th Cir. 2002), and provides that "no otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ," 29 U.S.C. § 794. "To establish a violation of § 504 of the RA, a plaintiff must show that (1) [he] is handicapped within the meaning of the RA; (2) [he] is otherwise qualified for the benefit or services sought; (3) [he] was denied the benefit or services solely by reason of [his] handicap; and (4) the program providing the benefit or services receives federal financial assistance." Lovell, 303 F.3d at 1052.

As stated in this Court's prior screening order, plaintiff's allegation that the regulation permitting inmates only six cubic feet of property in their cells violates his rights under the RA is patently frivolous. With respect to the First Amendment, plaintiff has supplied no basis for such a claim. The fact that plaintiff is required to exercise discretion in choosing which property he

keeps with him in his cell does not offend the Constitution.  Thus, plaintiff's claims against defendants Adams, Grannis, Alemedia, Gomez and Schwarzenegger regarding the regulation permitting inmates only six cubic feet of property in their cells fail.

13.    Establishment Clause

In Everson v. Board of Education of Ewing, 330 U.S. 1, at 15-16 (1947) the Supreme Court stated: "The 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force nor influence a person to go to or remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and *vice versa*."

Plaintiff states that defendants Alemedia, Schwarzenegger, Orth, Holmes, Duvall CCII, Adams, Grannis, Henry, Frost, Lee, Puguese, Gomez, Mendoza SATF/SP Mail Room, and Aguilar have instituted mail room procedures and have acted in a manner so as to violate the Establishment Clause by returning packages to the Light Bearers Ministry Prison Outreach stating they were not an approved religious vender, "[a]s opposed to 'all' non-religious books may come from 'any' book store or publisher." Doc. 31, pp 51-52.  It appears that plaintiff is trying to allege that the defendants' actions of denying him receipt of religious materials from the publisher(s) of his choice show a preference to one religion over his Seventh Day Adventist religion.  However, by his own allegations, plaintiff acknowledges that there are approved publishers from whom he might obtain materials, but finds them objectionable for being overpriced or not offering free or low cost materials.  Per his own allegations, there are reasonable opportunities available for plaintiff to obtain SDA publications/mailings from pre-approved publishers.  The fact that pre-

approved publishers do not offer publications that are "free or low cost" does not vitiate plaintiff's opportunity to pay for and receive their publications. Plaintiff's claims for violation of the Establishment Clause also fail as his claims are made against individual defendants – not the state or federal government.

### 14. Violation of the Plata and Armstrong Remedial Plans

Plaintiff may not pursue any claims in this action based on the alleged violation of the Plata and Armstrong Remedial Plans. To the extent that plaintiff wishes to seek assistance that he believes is due pursuant to either remedial plan, plaintiff "must pursue his request via the consent decree or through class counsel." Crayton v. Terhune, No. C 98-4386 CRB(PR), 2002 WL 31093590, *4 (N.D. Cal. Sept. 17, 2002). Plaintiff may not sue for damages in this action solely on the basis that defendants allegedly violated the remedial plans. Plaintiff's claims fail as a matter of law.

### 15. Supervisor Liability

Through out his complaint, plaintiff alleges that supervisors are involved and/or have implemented policies allowing the actions which plaintiff complains of.

Supervisory personnel are generally not liable under section 1983 for the actions of their employees under a theory of respondeat superior and, therefore, when a named defendant holds a supervisorial position, the causal link between him and the claimed constitutional violation must be specifically alleged. See Fayle v. Stapley, 607 F.2d 858, 862 (9th Cir. 1979); Mosher v. Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978), cert. denied, 442 U.S. 941 (1979). To state a claim for relief under section 1983 based on a theory of supervisory liability, plaintiff must allege some facts that would support a claim that supervisory defendants either: personally participated in the alleged deprivation of constitutional rights; knew of the violations and failed to act to prevent them; or promulgated or "implemented a policy so deficient that the policy 'itself is a repudiation of constitutional rights' and is 'the moving force of the constitutional violation.'" Hansen v. Black, 885 F.2d 642, 646 (9th Cir. 1989) (internal citations omitted); Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989). Although federal pleading standards are broad, some facts must be

alleged to support claims under section 1983.  See Leatherman v. Tarrant County Narcotics Unit, 507 U.S. 163, 168 (1993).

Plaintiff fails to state cognizable claims against Alemedia and Schwarzenegger for the "pervasive state of mind in all CDCR" in relation to the handling of Klarich's order for in cell feedings, as stated at Doc. 31., pg. 40, as plaintiff fails to show that either of these defendants personally participated in; knew of the violations and failed to act to prevent them; or promulgated or implemented a policy so deficient as to be the moving force behind the other defendants' actions of the mishandling of Klarich's cell feeding order.

Plaintiff's claims against Bhatt for failing to see to plaintiff's medical needs that were being neglected by Nyguen are based on respondeat superior and thus fail.  Doc. 31, pg. 49.

Plaintiff states cognizable claims against Adams, Rianda, Grannis, and Tilton for knowing that Cobbs and Diaz had caused plaintiff to be in a dangerous circumstance (of being a disabled convicted sex offender celled with a known violent and aggressive inmate who had just murdered another inmate) and of plaintiff being retained in a Level IV facility when he should have been placed in a Level III facility.  Yet they failed to investigate, prevent or correct the situation in disregard for the risk of serious injury to plaintiff.  Doc. 31, pg. 15.

Plaintiff states cognizable claims against Zimmerman, Bollard, Ward, Duvall, Cotes, Adams, Sanchez, Yates, Cobbs, Dahlberg, and Grannis for knowing of and condoning the retaliatory actions by Cotes & Figueroa as previously discussed in retaliation against plaintiff for petitioning to the courts for redress.  Doc. 31, pp. 32-33.

Plaintiff states cognizable claims against Adams, Rianda, and Grannis for creating policies, protocols, and "local operating procedures (OP)" of ignoring all administrative appeals, regardless of the danger a prisoner might be in.  Doc. 31., pp. 14.

Plaintiff states cognizable claims against Cotes, Duvall, Adams, Rianda, and Grannis for designing and implementing a policy and procedure of "calculated loss, destruction, denial of plaintiff's appeals" to stifle filing of inmate appeals and to delay exhaustion of administrative remedies.  Doc. 31, pp. 11-13.

///

Plaintiff states cognizable claims against Grannis and Tilton for creating policies of indifference and hands off approach that has allowed Santa Cruz's actions (as discussed hereinabove) to continue unabated and have created retaliatory deliberate indifference by custody staff.  Doc. 31, pg. 19.

Plaintiff states cognizable claims against Barbiro, Allison, McCant, Cotes, Appelbaum, Duvall, Arline, Aguillerra-Moreno, and Overly for setting up a policy of stalling, delaying, or totally losing inmate appeals regarding medications/medical issues to prevent exhaustion of administrative remedies in retaliation against plaintiff to prevent him from having access to the courts, and to inflict suffering and/or lingering death on plaintiff.  Doc. 31, pp. 28-29.

Plaintiff states cognizable claims against McCant and Bhatt for acknowledging, yet failing to correct/intervene regarding the handling of medical orders (issuing medical chronos prescribed but never issued/honored) by prison staff as discussed regarding the cell feeding order. Doc. 31, pg. 40.

Plaintiff states cognizable claims against Schwarzenegger, Alemedia, Bhatt and Adams for instituting policies and underground regulation calculated to guarantee a delay and/or interference with medical care for prisoners. Doc. 31, pg. 41

Plaintiff states cognizable claims against Bhatt, Adams, Alemedia and Schwarzenegger for implementing a policy in CDCR that staff can do no wrong, therefore any medical care (or no medical care, even deadly lack of care) is acceptable, and because of this policy, despite numerous complaints, Nyguen has not been trained, counseled or removed.  Doc. 31, pg. 47.

Plaintiff fails to state congizable claims against Adams, Schwarzenegger, Alemedia, Grannis, Henry, Frost, Lee, Pubuese, Holmes, Gomez, "[a]ll defendant supervisory staff," and AW Doe for originating and instigating a policy of banning all letters, newsletters, books, tracts, etc. from any unapproved religious organization.  Doc. 31, pp. 53-55.  As previously discussed, this policy is not a violation of constitutional rights.

17.    Failure to Train/Supervise

In City of Canton, Ohio v. Harris, 489 U.S. 378 (1989),  the Supreme Court held that, under certain circumstances, a municipality may be held liable based on the failure to train its

employees.  This court finds no authority for the extension of <u>City of Canton</u> and its progeny to a state prison official being sued in his personal capacity.  It appears to this court, following a review of the relevant case law, that the cases involving failure to train are limited to suits against city and county entities.  This is not to say that a plaintiff cannot allege facts involving the failure to train that are sufficient to state a claim under a theory of supervisory liability.  For instance, it is possible that the failure to train employees in a particular respect may amount to a policy or practice of failing to provide employees with adequate training, and that the policy or practice of failing to provide adequate training amounts to deliberate indifference.

Plaintiff alleges cognizable claims against Bhatt, Adams, Alemedia and Schwarzenegger for implementing a policy in CDCR that no staff can do wrong, therefore any medical care, or no medical care, even deadly lack of care, is acceptable, and because of this policy, despite numerous complaints, Nyguen has not been trained, counseled or removed.  Doc. 31, pg. 47.  The alleged originating and implementation of this policy was previously addressed.  As to the allegation that Bhatt, Adams, Alemedia and Schwarzenegger failed to train Nyguen, the court finds no authority to suggest that prison officials are responsible for training physicians who care for inmates beyond that which the physician should have received in obtaining his or her medical degree and continuing education as required to maintain his or her license to practice medicine.  Thus, plaintiff fails to state cognizable claims against Bhatt, Adams, Alemedia and Schwarzenegger for failing to train Nyguen.

II.     <u>Findings and Recommendation</u>

The Court finds that Plaintiff's second amended complaint states the following cognizable claim(s) for relief against the following defendants:

| <u>Defendant</u> | <u>Cognizable Claim(s)</u> |
|---|---|
| P. Figuero | Retaliation |
| A.W. Cobbs | Deliberate Indifference to Plaintiff's Safety<br>Condition(s) of Confinement (re in cell feedings)<br>Retaliation<br>Failure to Act/Implementation of Policy |
| R.M. Diaz | Deliberate Indifference to Plaintiff's Safety<br>Retaliation |

| | |
|---|---|
| A. Santa Cruz | Condition(s) of Confinement (re in cell feedings) Retaliation |
| T. Bareiro | Condition(s) of Confinement (re in cell feedings) |
| Dr. Klarich | Deliberate Indifference to Plaintiff's Serious Medical Needs |
| Dr. Nyguen | Deliberate Indifference to Plaintiff's Serious Medical Needs Retaliation |
| Dr. Deering | Deliberate Indifference to Plaintiff's Serious Medical Needs |
| Dr. Wu | Deliberate Indifference to Plaintiff's Serious Medical Needs Retaliation |
| D. Overly | Retaliation Failure to Act/Implementation of Policy |
| E. McCant | Failure to Act/Implementation of Policy |
| Dr. Bhatt | Failure to Act/Implementation of Policy |
| D. Adams | Failure to Act/Implementation of Policy |
| L.L. Rianda | Failure to Act/Implementation of Policy |
| N. Grannis | Failure to Act/Implementation of Policy |
| J. Tilton | Failure to Act/Implementation of Policy |
| Zimmerman | Failure to Act/Implementation of Policy |
| J. Bollard | Failure to Act/Implementation of Policy |
| J. Ward | Failure to Act/Implementation of Policy |
| D. Duvall | Failure to Act/Implementation of Policy |
| F.S. Cotes | Failure to Act/Implementation of Policy |
| D.W. Sanchez | Failure to Act/Implementation of Policy |
| D.W. Yates | Failure to Act/Implementation of Policy |
| C. Dhalberg | Failure to Act/Implementation of Policy |
| Barbiro | Failure to Act/Implementation of Policy |
| K. Allison | Failure to Act/Implementation of Policy |
| Appelbaum | Failure to Act/Implementation of Policy |
| Arline | Failure to Act/Implementation of Policy |
| Alemedia | Failure to Act/Implementation of Policy |

| | | |
|---|---|---|
| 1 | Aguillera-Moreno | Failure to Act/Implementation of Policy |
| 2 | A. Schwarzenegger | Failure to Act/Implementation of Policy |

Plaintiff's second amended complaint does not state any claims against any defendants other than as identified herein.

Accordingly, based on the foregoing, it is HEREBY RECOMMENDED that:

1. This action proceed on plaintiff's second amended complaint filed on August 13, 2007, against the defendants on the claims stated in the findings herein above;

2. All of plaintiff's claims against all any named defendant(s), other than as stated in the findings herein above, be dismissed with prejudice for failure to state a claim under 42 U.S.C. §§ 1983, 1985, or 1986; and

3. Defendants M. Hodges-Wilkins, Rick Manuel, R. Hansen, H.Dunn, M.D., Does Health Care Manager, Doe R.N., M. Poshner, M.D., Mendoza Mailroom, R. Frost, C. Haunai Henry, B. Gomez, J. Lopez, Does Internal Affairs CDCR, B. Morales, CO Seinz, CO Silva, Ruff R.N., R. Wessel, CO Orth, T. Holmes, R. Lee, and C. Puguese be dismissed based on plaintiff's failure to state a claim upon which relief may be granted against them.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). Within **thirty (30) days** after being served with these Findings and Recommendations, plaintiff may file written objections with the court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Plaintiff is advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v.Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:    March 19, 2008** _____ _____ /s/ Sandra M. Snyder _____
UNITED STATES MAGISTRATE JUDGE